# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **STEVEN L. HACKNEY,** | ) | |
| Plaintiff | ) | Civil Action No. 1:21cv00011 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## *I. Background and Standard of Review*

Plaintiff, Steven L. Hackney, ("Hackney"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hackney protectively filed an application for DIB on February 7, 2016, alleging disability as of October 12, 2012, due to cervical, thoracic and lumbar spinal injury; depression; erectile dysfunction; urinary retention; neuropathy; shoulder and clavicle injury; tension headaches; and hip and leg pain. (Record, ("R."), at 159, 370-71, 419, 435.) The claim was denied initially and on reconsideration. (R. at 182-84, 191-94.) Hackney requested a hearing before an administrative law judge, ("ALJ"). (R. at 195-96.) A hearing was held on July 10, 2018, at which Hackney was represented by counsel. (R. at 79-119.)

By decision dated October 24, 2018, the ALJ denied Hackney's claim. (R. at 159-71.) After the ALJ issued his decision, Hackney pursued his administrative appeals. (R. at 277-78, 495-502.) By order dated August 22, 2019, the Appeals Council remanded Hackney's claim and instructed the ALJ to give further consideration to Hackney's residual functional capacity;[2] to evaluate the opinion of Dr. Owens, pursuant to 20 C.F.R. § 404.1527 and explain the weight given to such evidence; and to cite to the appropriate legal authority while issuing a new

---

[2] The Appeals Council found the ALJ's residual functional capacity finding regarding Hackney's ability to balance was inconsistent. (R. at 179.) The ALJ's finding limited Hackney to "frequent" balancing and to "occasional" balancing. (R. at 179.)

decision.[3] (R. at 179-80.) Upon remand, the ALJ held supplemental hearings on May 26, 2020, and October 15, 2020, at which Hackney was, again, represented by counsel. (R. at 36-78.)

By decision dated November 3, 2020, the ALJ denied Hackney's claim. (R. at 12-29.) The ALJ found Hackney met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 14.) The ALJ found Hackney had not engaged in substantial gainful activity from October 12, 2012, the alleged onset date, through December 31, 2017, the date last insured.[4] (R. at 14.) The ALJ determined that, through the date last insured, Hackney had severe impairments, namely obesity; cervical and lumbar degenerative disc disease; and right shoulder bursitis, but he found Hackney did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14, 17.)

The ALJ found that, through the date last insured, Hackney had the residual functional capacity to perform sedentary[5] work, except he must alternate positions from sitting to standing for two to three minutes after every hour of sitting; he must

---

[3] The Appeals Council found the ALJ's 2018 hearing decision relied on improper legal authority. (R. at 179.) The ALJ cited 20 C.F.R. § 416.920(a) and (c), which is for supplemental security income, ("SSI"), claims. (R. at 179.) In addition, the hearing decision cited to Social Security Ruling 96-3p, which was rescinded prior to the date of the hearing decision. (R. at 179.)

[4] Therefore, Hackney must show he was disabled between October 12, 2012, the alleged onset date, and December 31, 2017, the date last insured, to be eligible for benefits.

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2021).

alternate positions from standing and/or walking to sitting for two to three minutes after every 30 minutes of standing and/or walking; he generally could remain on task except for position changes not covered by typical work breaks, but would be expected to be off task 10 percent of the overall workday; he could occasionally operate hand and foot controls, reach overhead with his right upper extremity, climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds, work at unprotected heights or around moving mechanical parts, operate a motor vehicle or be exposed to extreme cold or vibrations; and he could occasionally be exposed to weather, humidity and wetness. (R. at 18-19.) The ALJ found that, through the date last insured, Hackney was unable to perform his past relevant work. (R. at 27.) Based on Hackney's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Hackney could perform, including the jobs of an inserter, an assembler and a weight tester. (R. at 27-28, 71-72.) Thus, the ALJ concluded Hackney was not under a disability as defined by the Act from October 12, 2012, the alleged onset date, through December 31, 2017, the date last insured, and he was not eligible for DIB benefits. (R. at 29.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Hackney pursued his administrative appeals, (R. at 362-64, 528-35), but the Appeals Council denied his request for review. (R. at 1-5.) Hackney then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See*

20 C.F.R. § 404.981 (2021). This case is before this court on the Commissioner's motion for summary judgment filed November 1, 2021.[6]

## II. Facts

Hackney was born in 1977, (R. at 53), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has an associate's degree and past work experience as an emergency medical technician, ("EMT"). (R. at 44, 53, 420.)

In rendering his decision, the ALJ reviewed records from Dr. Sreeja Kadakkal, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Manish Gambhir, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Anbu K. Nadar, M.D.; Pikeville Medical Center; Buchanan General Hospital; Heartland Rehabilitation Services; Southern Medical Group, Inc.; Highlands Neurosurgery, P.C.; Trinity Medical Services; Buchanan Health Center, ("Buchanan Health"); and Arthur W. Stair, III, a licensed senior psychological examiner.

Medical expert, Dr. David Owens, M.D., testified at Hackney's July 2018 hearing. (R. at 83-93.) After reviewing Hackney's medical file, Dr. Owens stated Hackney's diagnostic imaging showed minimal to mild degenerative disc disease with or without spinal or nerve root compression. (R. at 84.) Dr. Owens stated Hackney experienced chronic low back and shoulder pain, secondary to neck pain radiation or impingement syndrome. (R. at 84-85.) He stated Hackney's physical

---

[6] Despite filing a Brief In Support Of Plaintiff's Motion For Summary Judgment, Hackney did not file a separate motion for summary judgment.

examinations revealed decreased range of motion of the lumbar spine, but he generally had no significant lumbar spine deficits in motor sensory and reflexes. (R. at 84.) Dr. Owens stated Hackney's treatment with physical therapy and epidural steroid injections was ineffective, and he received only slight improvement with a spinal cord stimulator. (R. at 84.) Dr. Owens opined Hackney's physical conditions did not meet or equal a listed impairment. (R. at 85.) He stated Hackney would be limited to lifting and carrying items weighing up to 10 pounds occasionally and less than 10 pounds frequently; he could sit a total of six hours in an eight-hour workday, but would require a sit/stand option; he could stand up no more than one hour in an eight-hour workday and walk "for maybe" 30 minutes in an eight-hour workday; he could occasionally climb ramps and stairs, balance, bend, crouch, kneel and crawl, but never climb ropes, ladders or scaffolds; he could frequently operate hand and foot controls; and he could not work around unprotected heights, temperature extremes or excessive vibrations. (R. at 85.) Dr. Owens stated it would be reasonable to expect Hackney's chronic pain to have some effect on his ability to concentrate. (R. at 92.)

Medical expert, Mary Eileen Buban, Psy.D., also testified at Hackney's July 2018 hearing. (R. at 94-99.) After reviewing Hackney's medical file pertaining to his mental health, Buban opined Hackney had no limitation in his ability to understand, remember and apply information; he had mild limitations in his ability to interact with others; he had moderate limitations in his ability to concentrate, persist and maintain pace based on chronic pain; and he was mildly limited in his ability to adapt or manage himself, although when his pain was more extreme, he could be moderately limited. (R. at 96-97.) She stated Hackney would be limited to no production, quota or strict time standard, fast-paced work, and he could

occasionally have difficulty with carrying out a complex task. (R. at 97.) Buban stated Hackney had received no mental health treatment prior to 2018. (R. at 98.)

On October 12, 2012, Hackney sustained work-related injuries to his right shoulder, lower thoracic spine, lower back and both testicles. (R. at 55-56, 538, 819-38.) On October 26, 2012, an MRI of Hackney's lumbar spine showed mild degenerative disc disease and mild bilateral neural foraminal narrowing at the L3-L4 and L4-L5 levels. (R. at 735.) An MRI of Hackney's thoracic spine showed minimal disc bulges at the T7-T8 and T8-T9 levels without canal stenosis or neural foraminal narrowing. (R. at 737.) On November 5, 2012, an MRI of Hackney's right shoulder showed mild edema at the acromioclavicular, ("AC"), joint and possible bursitis. (R. at 740.)

From November 2012 through April 2018, Hackney was treated for pain management at Pikeville Medical Center for complaints of right shoulder pain; back and neck pain; radiating pain into his right lower extremity; anxiety; insomnia; and "hypogonadism" or low sex drive. Hackney regularly reported his pain was aggravated by lifting, movement, bending, daily activities, twisting, walking and standing, and relieved by heat, medication, ice and use of a transcutaneous electrical nerve stimulation, ("TENS"), unit. (R. at 553, 566, 572, 577, 617, 661, 1230, 1244, 1256, 1262, 1268, 1296, 1302, 1316, 1343.) He described his pain as moderate to severe. (R. at 635.)

During this time, examinations routinely showed Hackney's thoracic and lumbar spine had decreased mobility, tenderness and paravertebral muscle spasm; his cervical spine had mildly reduced range of motion and muscle spasms; his lumbar spine had severe pain with range of motion; he had normal sensation;

normal strength in his bilateral upper extremities, except the right supraspinatus had 4/5; his wrists had normal strength and range of motion; he had limited range of motion of the right shoulder, but normal strength and no atrophy or deformities; his balance and gait were normal; he exhibited no gross or fine motor incoordination; he was fully oriented; he exhibited appropriate mood and affect; and his recent and remote memory were intact. (R. at 557-58, 563-64, 569-70, 576, 580, 584-85, 590-91, 595-96, 610-11, 621, 638, 665, 683, 698.)

On February 14, 2013, an MRI of Hackney's cervical spine showed a broad-based disc bulge with a focal right paracentral and foraminal disc herniation at the C6-C7 level, right-sided canal stenosis and neural foraminal narrowing. (R. at 538, 745-46.) On March 26, 2013, an MRI of Hackney's lumbar spine was suggestive of degenerative disc disease. (R. at 538, 742.) On April 18, 2013, Hackney underwent a cervical diskectomy and fusion, and he reported improvement with his neck and arm pain. (R. at 538, 750-52, 763-64.) On June 25, 2013, an MRI of Hackney's lumbar spine showed mild degenerative disc disease with disc protrusion at the L2-L3 level. (R. at 538, 622.)

From April 2013 through April 2017, Hackney treated with Dr. William T. Powers, M.D., and Tina M. Compton, N.P., a physician and nurse practitioner at Buchanan Health, for complaints of neck, back and shoulder pain; radiating pain to his right lower extremity; anxiety; and depression. During this time, Hackney had tenderness to palpation of the cervical and lumbar spine; he had decreased range of motion in the spinal area; his right shoulder had moderate tenderness with range of motion; he had mild pain with knee reflexes; he was fully oriented; and his mood and affect were stable. (R. at 879-80, 1036-37, 1041-42, 1044-45, 1048-49, 1052-53, 1056-57, 1060-61, 1064-65, 1068-69, 1071, 1078, 1081-82, 1085, 1090, 1093,

-8-

1100, 1103, 1106, 1111, 1114, 1117, 1121, 1125, 1131, 1179-80, 1228.) In October 2013, Compton reported Hackney's current MRI showed progression of his back injury. (R. at 1117.)

On December 10, 2013, Dr. Anbu K. Nadar, M.D., an orthopedic surgeon, evaluated Hackney for his complaints of persistent low back pain and right leg pain and numbness. (R. at 538.) Hackney's cervical spine had tenderness over the paravertebral muscles without spasms or weakness; he had intact reflexes and hypoesthesia of the right fourth and fifth fingers; his dorsolumbar spine had tenderness over the lumbosacral area, more to the right, with no spasm and intact reflexes and sensation; he was able to tiptoe and stand on his heels with some difficulty; he ambulated independently; and his right shoulder had no significant swelling, tenderness or instability. (R. at 539.) Dr. Nadar diagnosed cervical strain with radiculopathy, status post-cervical diskectomy and fusion at the C6-C7 level; lumbosacral strain with radiculopathy; and right shoulder strain. (R. at 540.) He opined Hackney was moderately disabled and had limitations in sitting, standing and walking for long periods. (R. at 541.) Dr. Nadar recommended Hackney treat his low back pain with analgesics, anti-inflammatories and epidural steroid injections. (R. at 541.) He opined Hackney was unable to return to his former employment at that time and suggested he consider an alternate vocation. (R. at 541.)

On October 1, 2014, Dr. David Weber, M.D., a physician with Pikeville Medical Center, surgically implanted a trial spinal cord stimulator, and on October 22, 2014, Hackney underwent permanent implantation of the spinal cord stimulator based on the amount of pain reduction and improvement of his activities of daily living the stimulator provided. (R. at 676-80, 688-89, 795-96.) The following

month, Hackney reported he received 40 to 50 percent pain relief in his right hip. (R. at 699.) However, the record later shows the stimulator provided only partial to slight pain improvement.[7] (R. at 84, 851, 1037, 1042, 1045, 1049, 1053, 1057, 1180, 1191.)

Throughout 2016, Dr. Powers and Compton reported Hackney had moderate tenderness in the right lower scapula; his right shoulder had normal range of motion with no pain or tenderness; his hip girdle, cervical and trapezius muscles were "very tight;" he was alert and cooperative; he had normal speech; he exhibited no evidence of hallucination, delusions or obsessions; his knee reflexes were mildly decreased; he was fully oriented; he had appropriate judgment and insight; his recent and remote memory were intact; his attention span and ability to concentrate were normal; and his mood, affect and depression were stable. (R. at 1016, 1147, 1154, 1156, 1180.) Hackney reported medications helped his neck and shoulder pain and improved his mood, but his pain symptoms increased during the colder months. (R. at 869, 1147, 1153.) On June 6, 2016, Dr. Powers expressed frustration because Hackney's physician at Pikeville Medical Center had him looking for jobs despite Dr. Powers's finding that Hackney unlikely would be able to maintain gainful employment.[8] (R. at 883.) On July 11, 2016, Dr. Powers opined

---

[7] In December 2016, Dr. J. Travis Burt, M.D., stated that, based on a review of Hackney's medical records, he did not believe the spinal cord stimulator was providing any pain relief and suggested it be removed. (R. at 906.)

[8] On May 2, 2016, Dr. Powers opined Hackney was unable to perform medium work. (R. at 881.) He restricted Hackney to light activity and stated he would "unlikely" be capable of maintaining gainful employment. (R. at 881.) On June 6, 2016, Dr. Powers opined Hackney was unable to work in any capacity, and there were no jobs that he could perform. (R. at 884-85.) He stated Hackney was to remain off work indefinitely. (R. at 884.)

Hackney had reached maximum medical improvement and revised his activity restrictions from light activity to sedentary. (R. at 1022.)

On March 28, 2016, Kimberly Stout, P.T., a physical therapist with Heartland Rehabilitation Services, performed a functional capacity evaluation. (R. at 841-47.) Stout reported Hackney performed all requested activities while in apparent pain. (R. at 847.) She reported Hackney's physical demand level was medium[9] work, but he was unable to perform medium work consistently for an eight-hour workday or 40-hour workweek. (R. at 841.) Stout stated Hackney frequently changed positions during the functional capacity evaluation, and his blood pressure remained elevated. (R. at 847.) Hackney consistently sat and stood with decreased weight bearing on the right side, and he had excessive perspiration during the evaluation.[10] (R. at 847.) Stout found Hackney performed with full effort throughout all aspects of testing despite his pain level. (R. at 841.) Hackney's pain questionnaires and scoring tests suggested Hackney suffered from a high pain focus. (R. at 842.)

On September 3, 2016, Dr. Edmund T. Vu, D.O., a physician with Southern Medical Group, Inc., examined Hackney at the request of Disability Determination Services. (R. at 849-52.) Hackney rated his pain level at six on a scale of one to 10, but stated he was independent with his activities of daily living. (R. at 849.) He was fully oriented and in no acute distress; he ambulated without assistance; his

---

[9] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2021).

[10] Hackney rated his pain level at eight and one-half on a scale of one to 10 following the functional capacity assessment, and he rated his pain level at eight the morning following the evaluation. (R. at 1154.)

gastrointestinal and musculoskeletal examinations were normal; testing of his right shoulder was positive for cervical radiculopathy and possible subacromial impingement; he could rise from a sitting position without assistance and stand on his tiptoes, heels and tandem walk without problems; he was unable to squat; he appeared to be in pain during testing; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; he was cooperative; he did not appear depressed or anxious; he was able to communicate with no deficits; he had intact recent and remote memory; he had good insight and cognitive function; and he had good tone and strength in all muscle groups, with normal reflexes and intact sensation. (R. at 850-51.) Dr. Vu diagnosed obesity; lower back pain; right shoulder pain, likely impingement; and neck pain.[11] (R. at 851.)

Dr. Vu opined Hackney could not sit, walk and/or stand for a full workday due to chronic pain in his lower back, neck and right shoulder; he could not lift and carry items weighing more than 10 pounds occasionally; and he could hold a conversation, respond appropriately to questions and remember and carry out instructions. (R. at 851.)

On September 12, 2016, Dr. Powers completed an assessment, finding Hackney could stand and/or walk a total of two hours in an eight-hour workday and could do so for up to 20 minutes without interruption; he could sit for one to two hours in an eight-hour workday and could do so for up to 20 minutes without interruption; he could stoop and kneel "very little" and never climb, balance, crouch or crawl; he could occasionally push and pull; and he would be absent from

---

[11] Dr. Vu's remaining diagnoses were based on Hackney's history. (R. at 851.)

work more than two days a month.[12] (R. at 861-62.) Dr. Powers found Hackney had no environmental restrictions. (R. at 862.) Dr. Powers opined Hackney was unable to maintain gainful employment. (R. at 862.)

On September 23, 2016, Dr. Sreeja Kadakkal, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), finding Hackney did not suffer from a severe mental impairment. (R. at 129-30.) He opined Hackney had no limitations on his activities of daily living; he had no difficulties in maintaining social functioning or maintaining concentration, persistence or pace; and he had experienced no repeated episodes of decompensation for an extended duration. (R. at 129.) On November 21, 2016, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Dr. Kadakkal. (R. at 146-47.)

On September 26, 2016, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, finding Hackney had the residual functional capacity to perform light[13] work, except he could stand, walk and sit six hours each in an eight-hour workday; he could occasionally push/pull and reach overhead with his right upper extremity; he had an unlimited ability to perform postural activities, except he could occasionally climb ladders, ropes or scaffolds and crawl; and he should avoid concentrated exposure to hazards, such as

---

[12] Dr. Powers did not assess Hackney's lifting ability because the functional capacity evaluation was stopped prior to the lifting portion of the test due to Hackney's hypertension. (R. at 861.)

[13] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

machinery and heights. (R. at 132-34.) Dr. McGuffin opined Hackney had no visual or communicative limitations. (R. at 133.)

On November 21, 2016, Dr. Manish Gambhir, M.D., a state agency physician, completed a medical assessment, finding Hackney had the residual functional capacity to perform light work, except he could stand, walk and sit six hours each in an eight-hour workday; he could occasionally push/pull and reach overhead with his right upper extremity; he could frequently climb ramps and stairs and balance; he could occasionally climb ladders, ropes or scaffolds, stoop, kneel, crouch and crawl; and he should avoid concentrated exposure to vibrations and work hazards, such as machinery and heights. (R. at 148-51.) Dr. Gambhir opined Hackney had no visual or communicative limitations. (R. at 150.)

On December 5, 2016, Hackney saw Dr. Powers and reported his back and right leg pain was more symptomatic, especially with the weather changes. (R. at 1016.)

On December 27, 2016, Dr. Burt, a neurosurgeon at Highlands Neurosurgery, P.C., conducted an independent medical evaluation. (R. at 900-07.) Hackney reported his pain became so severe that he had to increase the intensity of his spine stimulator to the point that the stimulation hurt more than the normal pain syndrome. (R. at 902.) Hackney was fully oriented; his speech was fluent; his affect was appropriate; he appeared to be in pain; he was able to remember details specific to his case without hesitation; his back had a well-healed midline incision of the upper lumbar spine; his joints had no tenderness; palpation of the lumbar spine failed to demonstrate evidence of spasm, but Hackney voiced some soft complaints of subjective pain to direct, deep palpation; straight leg raising tests

were negative; he had normal sensation; his deep tendon reflexes were 1+, bilaterally, but symmetric; he had no fasciculations or atrophy in his lower extremities; and he had full motor strength throughout. (R. at 903.) Dr. Burt reported Hackney would be an "excellent candidate to return to work" after a six-to-12-week program of physical therapy followed by a work conditioning program. (R. at 907.) In addition, based on the radiographic findings of Hackney's lumbar spine and his examination, Dr. Burt opined Hackney could return to work in a full-duty capacity. (R. at 907.)

Throughout 2017 and 2018, Hackney was treated at Pikeville Medical Center, reporting low back pain that radiated into his right lower extremity, as well as hypogonadism. (R. at 1230-1355.) Examinations showed Hackney's lumbar spine had moderate pain with motion; his cervical spine and right shoulder had mild pain with motion; he had a normal gait; he was fully oriented; he had an appropriate mood and affect; and his insight and judgment were normal. (R. at 1232, 1246, 1252, 1258, 1264, 1278, 1298, 1304-05, 1311-12, 1318, 1326, 1339.) In May and November 2017, Dr. Weber restricted Hackney from performing all activities for six months. (R. at 1275, 1322.)

From January through April 2017, Hackney saw Dr. Powers, reporting back, right hip, right leg and right shoulder pain, as well as pressure and tightness in his neck. (R. at 1140-43.) Hackney reported a 10 percent pain reduction after his stimulator was reprogrammed. (R. at 1142.) Hackney's straight leg raising tests were negative; his knee reflexes were intact; and he had full range of motion of the neck with no trigger points. (R. at 1140-41.)

On March 13, 2017, Dr. Powers completed an assessment, finding Hackney could occasionally lift and carry items weighing five pounds; he could never climb, stoop, kneel, balance, crouch or crawl; and he would be absent from work more than two days a month. (R. at 857-59.) Dr. Powers found Hackney had no environmental restrictions. (R. at 859.) As to the number of hours Hackney could stand and/or walk in an eight-hour workday, Dr. Powers noted it was "unknown," but "not much." (R. at 857.) He also noted the number of hours Hackney could sit was "not quantified." (R. at 858.) Dr. Powers stated Hackney was unable to sustain medium work for more than a few minutes as he "quickly breaks down." (R. at 856.) He stated Hackney's sustainable exertional level was below "light" work. (R. at 856.) In addition, Dr. Powers noted he had no information that allowed him to "quantify" most of the activities in the assessment. (R. at 856.)

On May 10, 2018, Dr. Rebekah Crump-Austin, M.D., a physician with Trinity Medical Services, examined Hackney. (R. at 1367-71.) Hackney rated his pain level between five and 10. (R. at 1367.) Hackney was pleasant and cooperative; he appeared uncomfortable and in moderate distress; he frequently shifted seated position; he was fully oriented; he had fluent speech; he had a wide-based, antalgic gait; he had mild tenderness to palpation of the cervical spine with mild paraspinous muscle spasms; he had moderate tenderness to palpation of the lumbar spine with moderate paraspinous muscle spasms; he had mild limitation in his cervical range of motion; his straight leg raising tests were negative; he did not have pain with inversion or eversion of the hips; he had full strength in all muscle groups; and he had intact sensation. (R. at 1369-70.) Dr. Crump-Austin diagnosed lumbar degenerative disc disease/chronic lower back pain with bilateral radiculopathy; herniated nucleus pulposus of the C6-C7 disc space/chronic cervicalgia; vertigo; and depression. (R. at 1371.) She opined Hackney could stand

for approximately 10 to 15 minutes; walk 25 yards without interruption; and sit for less than one hour without interruption. (R. at 1371.)

On May 22, 2018, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, evaluated Hackney at the request of Hackney's attorney. (R. at 1375-80.) Hackney had good hygiene and grooming; his balance, gait and posture were mostly within normal limits; he was a good historian; he was cooperative; he was fully oriented; he had marginally intact short-term memory; his thinking pattern was well-organized; his affect was dysphoric; he was anxious; his attention span was fair; his speech was normal; and he made good eye contact. (R. at 1375, 1377.) The Personality Assessment Inventory, ("PAI"), test was administered, which indicated Hackney was moderately depressed, anxious and agitated. (R. at 1379.) Stair diagnosed generalized anxiety disorder, moderate to severe, and major depressive disorder, moderate to severe. (R. at 1380.) Stair opined Hackney's ability to understand and carry out simple information or directions was mildly impaired; his abilities to comprehend and implement complex instructions and to adapt to changes in the workplace were moderately impaired; and his abilities to maintain persistence and concentration and to interact socially were markedly impaired. (R. at 1379-80.)

On June 12, 2018, Dr. Crump-Austin completed a medical assessment, finding Hackney could occasionally lift and carry items weighing up to 12 pounds and up to eight pounds frequently; he could stand and/or walk up to four hours in an eight-hour workday and could do so for less than one hour without interruption; he could sit up to four hours in an eight-hour workday and could do so less than one hour without interruption; he could occasionally stoop and balance and never climb, kneel, crouch and crawl; he had a limited ability to reach and to push/pull;

he was restricted from working around heights and moving machinery; and he would be absent from work more than two days a month. (R. at 1372-74.) She also found Hackney's depression affected his ability to focus, to maintain attention and to interact with the public. (R. at 1374.) Dr. Crump-Austin opined Hackney's impairments existed on or before his date last insured of December 31, 2017. (R. at 1374.)

On June 15, 2018, Stair completed a mental assessment, indicating Hackney had a seriously limited to no useful ability to make occupational, performance and personal-social adjustments. (R. at 1381-83.) He opined Hackney would be absent from work more than two days a month. (R. at 1383.) Stair also opined Hackney's impairments existed on or before his date last insured of December 31, 2017. (R. at 1383.)

On August 4, 2018, Dr. Eddie Brown, D.O., a physician with Southern Medical Group, Inc., examined Hackney at the request of Disability Determination Services. (R. at 1393-97.) Hackney alleged disability due to back and neck pain, and he rated his back pain level at six and his neck pain level at four. (R. at 1393.) Hackney reported he was independent with his activities of daily living. (R. at 1394.) Hackney was in no acute distress; he had a normal gait and ambulated without assistance; his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; his extremities had no edema, cyanosis or erythema; he was able to sit in no significant distress, walk and stand in the office; he had good, bilateral motor tone and strength in all muscle groups; his reflexes and sensation were normal; he had no muscle asymmetry, atrophy or involuntary movements; straight leg raising tests were positive on the right; he had joint tenderness in the cervical spine, but no signs of joint instability, inflammation

or deformity; and he had no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint, except as already mentioned. (R. at 1394-96.)

Mental examination revealed Hackney was fully oriented and cooperative; he did not appear to be depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; he had good insight and cognitive function; and he showed no signs of mood instability or concentration difficulty. (R. at 1395-96.) Dr. Brown diagnosed cervicalgia and lumbar degenerative disc with radiculopathy. (R. at 1395.) Dr. Brown opined Hackney "unlikely" would be able to walk and/or stand for a full workday; he "may be" able to sit a partial workday with allotted occasional breaks; he would be limited to lifting and carrying items weighing less than 10 pounds because his condition "may be" exacerbated by lifting or carrying excessive weight; and he should refrain from excessive bending, stooping and crouching. (R. at 1396.)

That same day, Dr. Brown completed a medical assessment, finding Hackney could occasionally lift and carry items weighing up to 20 pounds; he could stand up to one hour in an eight-hour workday and could do so for up to 15 minutes without interruption; he could walk up to 30 minutes in an eight-hour workday and could do so for up to 10 minutes without interruption; he could sit up to one hour in an eight-hour workday and could do so up to 30 minutes without interruption; he could frequently feel with both upper extremities; he could never reach overhead, bilaterally, but could occasionally reach in all other directions, handle, finger and push/pull, bilaterally; he could occasionally operate food controls with both feet; he could occasionally balance and never climb, stoop, kneel, crouch or crawl; he could occasionally work around moving mechanical

parts, operate a motor vehicle, work around humidity, wetness and temperature extremes and never work around unprotected heights, dust, odors, fumes and pulmonary irritants and vibration; and he would need to work in a quiet environment. (R. at 1398-1403.)

On October 8, 2019, Dr. Weber completed a medical assessment, finding Hackney could occasionally lift and carry items weighing up to 10 pounds and up to five pounds frequently; he could stand and/or walk up to two hours in an eight-hour workday and could do so for less than one hour without interruption; he could sit up to three hours in an eight-hour workday and could do so for one hour without interruption; he could occasionally kneel, balance and crouch and never climb, stoop or crawl; he had a limited ability to reach, to handle, to feel, to see, to hear and to speak; he was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, humidity and vibration; and he would be absent from work more than five days a month. (R. at 1405-08.) He opined Hackney's impairments existed on or before his date last insured of December 31, 2017. (R. at 1408.) Dr. Weber based his opinion on "monthly observations for [the] past 5 years." (R. at 1406.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he

can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hackney argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of his treating and examining physicians, and by giving significant weight to the medical expert's opinion. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-17, 20-21.) Hackney argues the ALJ failed to properly evaluate his allegations of pain. (Plaintiff's Brief at 11-15, 21.) Hackney further argues the hypothetical posed to the vocational expert did not include all his impairments. (Plaintiff's Brief at 17-21.)

While Hackney does not expressly argue the ALJ erred in failing to consider whether he was entitled to a closed period of disability, remand may be warranted if the ALJ fails to consider whether a claimant may have been disabled for a closed period. *See Allen v. Colvin*, 2017 WL 2399591, at *4 (D. Md. June 1, 2017)

(citation omitted); *Shiplett v. Colvin*, 2016 WL 6783270, at *13 (W.D. Va. Nov. 16, 2016). The regulations define disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (2021); *see* 20 C.F.R. § 404.1509 (2021) (defining the "duration requirement" as an impairment that "must have lasted or must be expected to last for a continuous period of at least 12 months."). The ALJ found Hackney was not disabled at any time from his alleged onset date of October 12, 2012, through his date last insured, December 31, 2017. (R. at 29.)

In December 2016, Dr. Burt reported Hackney would be an "excellent candidate to return to work" *following* a six-to-12-week program of physical therapy *followed* by a work conditioning program. While the ALJ discussed Dr. Burt's examination findings, he failed to mention his finding that Hackney could return to work after completing a physical therapy program and a work conditioning program. Furthermore, in both May and November 2017, Dr. Weber restricted Hackney from performing all activities for six months. The ALJ gave "no weight" to Dr. Weber's finding that Hackney could not return to work or that he had a two percent change of returning to work (R. at 23.) The ALJ stated Dr. Weber's evaluation was done in "connection with [Hackney's] workers' compensation claim, and workers' compensation standards and social security stands for evaluating concepts like disability are very different." (R. at 23.) While Dr. Weber may have evaluated Hackney on his workers' compensation claim, he was Hackney's pain management physician and treated him routinely for years.

The ALJ also rejected Dr. Weber's April 2017 work excuse, but failed to mention his May and November 2017 work excuses precluding Hackney from working for 12 consecutive months. (R. at 25, 898.) This, in conjunction with Dr. Burt's finding that Hackney would be an "excellent candidate to return to work" *following* a six-to-12-week program of physical therapy *followed* by a work conditioning program, would prevent Hackney from working longer than 12 consecutive months. Based on this, I do not find substantial evidence exists in the record to support the ALJ's finding that Hackney was not disabled at any time from his alleged onset date of October 12, 2012, through his date last insured, December 31, 2017.

Hackney argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of his treating and examining physicians and giving significant weight to the medical expert's opinion. Plaintiff's Brief at 8-17, 20-21.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found that, through the date last insured, Hackney had the residual functional capacity to perform a limited range of sedentary work. Particularly, the ALJ found Hackney must alternate positions from sitting to standing for two to three minutes after every hour of sitting, and he must alternate positions from standing and/or walking to sitting for two to three minutes after every 30 minutes of standing and/or walking. (R. at 18.) Otherwise, the ALJ placed no time limitation on Hackney's ability to sit and stand/walk, despite the fact that every physician who rendered an opinion on Hackney's residual functional capacity placed overall time limitations on these activities.

In making this residual functional capacity finding, the ALJ gave no weight to the opinions of Drs. Nadar, Vu, Powers, Weber and Crump-Austin, essentially all of Hackney's treating and examining physicians. (R. at 22-25.) Instead, the ALJ gave "significant weight" to the testimony of medical expert, Dr. Owens. (R. at 20-21.) The ALJ stated Dr. Owens "gave an excellent summary of the physical evidence" contained in the record. (R. at 20.) However, the ALJ gave "limited weight" to Dr. Owens's opinion that Hackney could only stand for one hour and walk for 30 minutes in an eight-hour workday because the medical evidence did not support these limitations. (R. at 21.) The ALJ also stated Dr. Owens did not explain why Hackney was more limited than the "typical limitations of sedentary work." (R. at 21.) Yet, the ALJ further stated Dr. Owns reviewed all the relevant evidence and opined Hackney could perform sedentary work. (R. at 24.) While the ALJ found the medical evidence did not support Dr. Owens's finding that Hackney could stand for one hour and walk for 30 minutes in an eight-hour workday, Hackney's treating and examining physicians placed similar restrictions on his ability to stand, walk and/or sit.

In 2013, Dr. Nadar opined Hackney was "moderately disabled" and had limitations in sitting, standing and walking for long periods. (R. at 541.) In 2014, Hackney's thoracic and lumbar spine had decreased mobility, tenderness and muscle spasm, and he had severe pain with range of motion of the lumbar spine. (R. at 621, 638, 672.) In December 2015, Hackney reported he was in constant pain "all day," and his pain was worsened by sitting longer than 30 minutes and standing and/or walking longer than 15 minutes. (R. at 871.) In September 2016, Dr. Vu reported Hackney appeared to be in pain during testing and opined Hackney could not sit, walk and/or stand for a "full workday." (R. at 850-51.) In September 2016, Dr. Powers opined Hackney could sit up to two hours total in an

eight-hour workday and for up to 20 minutes without interruption; and he could stand and/or walk up to two hours total in an eight-hour workday and for up to 20 minutes without interruption. (R. at 861-62.) In August 2018, Dr. Brown opined Hackney could stand up to one hour in an eight-hour workday and could do so for up to 15 minutes without interruption; he could walk up to 30 minutes in an eight-hour workday and could do so for up to 10 minutes without interruption; and he could sit up to one hour in an eight-hour workday and could do so up to 30 minutes without interruption. (R. at 1399.) In October 2019, Dr. Weber opined Hackney could stand and/or walk up to two hours total in an eight-hour workday and for less than one hour without interruption; and could sit up to three hours total in an eight-hour workday and for up to one hour without interruption. (R. at 1406.)

As noted above, the regulations state that jobs are sedentary if walking and standing are required occasionally. *See* 20 C.F.R. § 404.1567(a). Social Security Ruling 96-9p defines "occasionally" as occurring from very little up to one-third of the time and would generally total no more than about two hours in an eight-hour workday. *See* Social Security Ruling, ("S.S.R."), 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1996), 1996 WL 374185 (July 2, 1996). According to S.S.R. 96-9p, the residual functional capacity is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis, i.e., eight hours a day, for five days a week, or an equivalent work schedule. *See* S.S.R. 96-9p, 1996 WL 374185, at *2. Therefore, I do not find substantial evidence exists to support the ALJ's residual functional capacity finding.

Based on the above, I recommend the court remand Hackney's claim for further consideration to determine whether Hackney was disabled for a closed period of 12 months or more and to further address his physical residual functional

capacity finding. Based on my finding on this issue, I will not address Hackney's remaining arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist in the record to support the ALJ's weighing of the medical evidence;

2.    Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence does not exist in the record to support the Commissioner's finding that, through the date last insured, Hackney was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand Hackney's claim to the Commissioner for further development.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    May 17, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE